## BAJUS *v.* SYRACUSE, B. & N. Y. R. Co.

*(Supreme Court, General Term, Fourth Department. January, 1889.)*

1. NEGLIGENCE—DEFECTIVE APPLIANCES—EVIDENCE.

    Plaintiff, while endeavoring to uncouple a train consisting of eight loaded cars and four empty ones, which was slowly moving backward to release the pressure on the coupling pins, was thrown down, and a wheel passed over his leg. He contended that the accident was caused by defects in the engine, which prevented the engineer from stopping the train immediately upon his call. There was evidence that steam leaked through the throttle-valve; that, on one occasion, enough steam leaked through, in 10 or 15 minutes, to move the engine, with nothing attached, 4 or 5 lengths; and in 4 or 5 minutes, on another occasion, to move it 20 feet. The fireman, who was sworn for plaintiff, testified that the train did not move more than 5 feet after plaintiff called. The engineer and two other employés of defendant were present, but they were not called as witnesses. *Held* insufficient evidence to justify a finding that the accident was caused by defects in the engine.

2. SAME—CONTRIBUTORY NEGLIGENCE.

    There were present and unemployed at the time of the accident, a switchman and a coupler, subject to the orders of plaintiff, who was yard-master, and who had control of the movement of the train. *Held,* that plaintiff was negligent in attempting to uncouple the cars while moving; and especially in not placing one of the other employés where he could have immediately communicated plaintiff's signals to the engineer while in the dangerous position.

Appeal from circuit court, Onondaga county.

Action by Louis Bajus against the Syracuse, Binghamton & New York Railroad Company for personal injuries received while in defendant's employ. Plaintiff appeals.

Argued before FOLLETT, P. J., and MARTIN, J.

*Goodelle & Nottingham,* for appellant. *Jenney, Brooks, Marshall & Ruger,* for respondent.

FOLLETT, P. J.   Appeal from a judgment dismissing the complaint, with costs, entered upon a nonsuit, and heard in this court on a case which contains all of the evidence.   September 7, 1876, the plaintiff entered the defendant's service as yard-master at Syracuse, and continued therein until he received the injury hereinafter described.   It was his duty to shift cars from incoming to outgoing trains, and to place them in position for loading and unloading.   This work was done by a shifting locomotive, known as "George Skinner, No. 2," which was run by Frank Tompkins, engineer, and Phillip Callahan, fireman.   Patrick Wall, a switchman, and Otto Miller, a coupler, were also employed in this yard.   These four men were subject to the command of the plaintiff, whose duty it was to direct them, and supervise the work in the yard.   Before entering defendant's service, the plaintiff had served as a brakeman for three years on another railroad.   The tracks in this yard extend north and south, the grade ascending towards the south, but how sharply is not disclosed by the record.   The freight-house is on the east side of the yard.   The first track west of the freight-house is known as the "freight-house track," the second track west is known as the "coal-shed track," and the third track west is known as the "freight track."   South of the freight-house these tracks are connected by switches.   In the early morning of February 5, 1877, seven freight-cars stood on the freight-house track; the four northerly ones having been unloaded.   Five loaded freight-cars stood on the freight-track, which it was necessary to take to the freight-house to be unloaded.   This locomotive was attached to the five cars, and drew them south past the switch which connected the freight-house track; then this train backed north, via the switch, onto the freight-house track, and was attached to the seven cars standing in front of the freight-house on the freight-house track.   The train, so made up of the locomotive and 12 freight-cars,— 8 loaded and 4 empty,—then ran south, up the grade, for the purpose of passing, via the switch, onto the freight track, then backing north on that track past the switch, and there detaching and leaving the 4 empty cars; and then, by drawing the 8 loaded cars south, past the switch, and then backing them north, via the switch, onto the freight-house track, and down it to the freight-house, for the purpose of having them unloaded.   In attempting to draw the train south, up the grade, on the freight-house track, it was stalled.   Thereupon the plaintiff directed the engineer to back the train and relieve the strain upon the links uniting the cars, so that he might uncouple and detach some of them, and enable the locomotive to go forward with part of the train.   The plaintiff and Patrick Wall, his switchman, were near together on the west, or right, side of the train, which is the engineer's side. When the couplings were slacked by the backward movement, the train still moving slowly back, the plaintiff stepped partly between the third and fourth cars back from the locomotive.   He was faced to the north, in the direction the train was moving, and with his back to the engineer.   His right foot was between the rails, but his left one was outside, or west, of the west rail. While walking along in this position, he attempted to draw, first one, and then the other, coupling pin, but failed to remove either.   As he was about to step from between the cars, the toe of his right foot struck a tie, the face of which was higher than the ground, momentarily retarding his free movement and throwing his heels upward, at which moment the brake-beam of the car behind came in contact with the back part of his heel, holding the toe against the ground and the heel under the brake-beam so firmly that he could not extricate himself.   In this position he was forced along by the train, hobbling on his left foot, for about 45 feet, when his right foot caught in a frog, by which he was held firmly, and a wheel of the car passed over and crushed his right leg.   When his heel was first caught he shouted to his switchman, "Oh, Pat! Oh, Pat!" and continued to call until the wheel passed over his leg.   This is the plaintiff's account of the accident.   Neither the en-

gineer, switchman, nor coupler was sworn; but Callahan, the fireman, who was sworn for the plaintiff, testified that the train did not move more than five feet after the plaintiff cried out.

This action was brought to recover damages for this injury. The plaintiff rests his right to recover upon the ground that the defendant negligently furnished a defective locomotive, which was the cause of the injury. The defects specified, and particularly relied upon, were that the throttle-valve and the valve between the steam-chest and the cylinders, known as "slide-valves," were so leaky that the locomotive could not be quickly stopped, or efficiently controlled, by the engineer. This case has been three times tried. On the first trial the plaintiff had a verdict for $8,000 damages, which was reversed by the general term. 16 N. Y. Wkly. Dig. 109. Upon the second trial the plaintiff had a verdict for $7,000 damages, which was affirmed by the general term, (34 Hun, 153,) but was reversed by the court of appeals (103 N. Y. 312, 8 N. E. Rep. 529) upon the ground that the evidence did not establish that the accident was caused by the leakage of the valves. The throttle-valve permits or prevents the passage of steam from the boiler to the two steam-chests. When a locomotive is propelled by steam, the throttle-valve is necessarily open, partially or entirely, and its leaking has no effect upon the power of the engine when in motion. If, when closed, this valve leaks steam, it passes into the chests, and, if continued for a sufficient length of time, the chests are filled, and the steam passes from the chests into the cylinders, moves the pistons, and sets the machinery in motion. It is material to inquire whether the condition of the throtle-valve was a cause of the injury; and, to determine this, the circumstances must be considered. When the plaintiff ordered the engineer to back the train, or change it from the forward to the backward motion, the lever was thrown over and the engine set in the backward motion. The train was then going down, instead of up, grade; the throttle was closed, and no steam was being used. When the plaintiff's cry was heard, the engineer reversed the lever, which set the train in the forward motion, opened the throttle, which admitted steam to the cylinders, and, had the pressure been continued, would have moved the train forward, but the throttle was immediately closed. The effect of this was to at once check the backward movement of the train, and not move it forward any distance. This was done to remove it quickly from the entangled person, and not to endanger him by moving the train any distance in the opposite direction. This would produce a "jerky movement," the extent of which would depend largely upon how the cars were coupled. The plaintiff's theory is that the train was moving slowly down the grade by its own momentum, with the throttle-valve closed, and that sufficient steam leaked through the valves and into the steam-chest to suddenly accelerate the movement of the train, which is described by him as a "lunge." The extent of this leak can only be inferred from the evidence of the witnesses, who testify that on two occasions, some time before the accident, sufficient steam leaked through the closed throttle-valve to start the locomotive. One occasion was three weeks before the accident, when, after standing 10 or 15 minutes, sufficient steam leaked through the valve and accumulated in the steam-chest to move the locomotive, with nothing attached, four or five lengths. On another occasion sufficient steam leaked to move it 20 feet in 4 or 5 minutes. From the time the throttle was closed, and the train changed from the forward to the backward movement, under the plaintiff's directions, until he was injured, it traveled backward less than 100 feet, according to his evidence. The evidence is entirely insufficient to sustain a finding that sufficient steam could have leaked through the throttle in this short space of time to have materially accelerated the movement of the locomotive with 12 cars attached. Between each steam-chest and its accompanying cylinder is a valve called a "slide-valve." These slide-valves are moved horizontally, when the locomotive is in motion, by

rods connected with the machinery, permitting the steam to pass from the chest, first into one end and then into the other end of the cylinder, thus moving the pistons. After the steam has spent its force on the pistons, it should pass out through the exhaust port. If the slide-valves imperfectly fit their seats, steam leaks between them and their seats, passing from the end of the cylinder at which it first enters into the other end, without exerting its full force upon the pistons and affording resistance at the other end, thus diminishing the power of the engine. These valves are never at rest when the locomotive is in motion, and are seldom perfectly closed when the locomotive is at rest, unless care is taken to stop the drivers in a position which just closes them. There is little or no evidence as to the extent that steam leaked between the slide-valves and their seats, and not sufficient to justify a finding that their condition materially lessened the power of the locomotive to stop this slowly moving train. The evidence upon the second trial as to the condition of the valves is not materially changed on this trial. The fact, if it is a fact, that the locomotive was defective, and the defendant's superintendent knew it, and had violated his promise to furnish a new engine for this work, are inconsequential unless the evidence is sufficient to raise a question of fact as to whether such defects caused the accident; and we think that it must be held, under the decision of the court of appeals, that the evidence is insufficient to carry this question to the jury.

Again, this plaintiff was in charge of that yard, and had control of the movement of this train. There seems to have been little excuse for him to uncouple this train while in motion, and less excuse for placing himself in this position, where he was without power to communicate quickly with the engineer, when he had at his command a coupler and switchman on the spot, and at that moment unemployed, either of whom might have been so stationed as to have instantly transmitted his signal to the engineer. We think that, upon the whole case, the plaintiff is not entitled to recover, and was properly nonsuited. The judgment and order are affirmed, with costs.